IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No: 5:09-CV-379-FL

| | | |
|---|---|---|
| SHARON A. MERCER, | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM AND** |
| v. | ) | **RECOMMENDATION** |
| | ) | |
| NORTH CAROLINA DEPARTMENT OF | ) | |
| TRANSPORTATION and NORTH | ) | |
| CAROLINA DIVISION OF MOTOR | ) | |
| VEHICLES LICENSE & THEFT BUREAU, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on Defendant's motion [DE-24] for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff has responded [DE-29] to Defendant's motion, Defendant has replied [DE-31] and the matter is ripe for disposition. The parties have not consented to the jurisdiction of the magistrate judge; therefore, the motion is considered here as a recommendation to the District Court. *See* 28 U.S.C. § 636(b)(1)(B); *see also* Local Civil Rule 72.3(c). For the reasons set forth below, this court recommends Defendant's motion for summary judgment be allowed in part and denied in part.

## I. PROCEDURAL HISTORY

Plaintiff Sharon Mercer ("Plaintiff"), an African-American female, initiated this action against the North Carolina Department of Motor Vehicles ("DMV") License & Theft Bureau ("the Bureau" or "Defendant") alleging Defendant committed various acts of employment discrimination in violation of her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1983. In particular, Plaintiff argues she was subjected to

discriminatory discipline based on her race and gender and retaliated against after having complained of unlawful gender discrimination to the North Carolina Office of Administrative Hearings ("OHA"). Compl. ¶¶ VI, IX. Defendant filed its Answer [DE-11] on 27 October 2009, generally denying the allegations and raising several affirmative defenses. On 9 July 2010, Defendant moved for summary judgment [DE-24]. On 6 August 2010, Plaintiff filed a Response [DE-29] in opposition to Defendant's motion and on 20 August 2010, Defendant filed a Reply [DE-31].

## II.  FACTUAL BACKGROUND

In 2001, Plaintiff was hired by the DMV for the position of Law Enforcement Officer I. Decl. of Sharon Mercer ("Pl.'s Decl.") ¶ 3 [DE-30]. In 2004, Plaintiff was promoted to the position of Inspector at the DMV office in Rocky Mount, North Carolina, and remains employed in this position. Pl.'s Decl. ¶ 3; Bozard Dep. 28:1-3. Between September 2006 and October 2008, Plaintiff applied unsuccessfully for a "number of promotions" within the DMV and subsequently filed grievances with the DMV's Department of Human Resources and with the OHA. Pl.'s Decl. ¶¶ 4-5 [DE-30]; Pl.'s Ex. 2, Def.'s Resp. Interrog. ¶ 1 [DE-29.2]. Between 24 June 2008 and 4 November 2008, Plaintiff submitted applications for five positions within the DMV and was interviewed for two of these positions. Pl.'s Ex. 2, Def.'s Resp. Interrog. ¶ 1 [DE-29.2]. Three of the positions are presently occupied by an Hispanic male, a white male and a black male. Pl.'s Ex. 2, Def.'s Resp. Interrog. ¶ 1 [DE-29.2]. Interviews were never conducted for the remaining two positions, which remain vacant. Pl.'s Ex. 2, Def.'s Resp. Interrog. ¶ 1 [DE-29.2].

Subsequently, Plaintiff filed grievances with the DMV's Department of Human Resources[1]

---

[1] Plaintiff does not provide the dates on which the grievances were filed, stating only that they were filed following her denial for promotions sought between September 2006 and October 2008. Pl.'s Decl. ¶¶ 4-5 [DE-30].

2

and on 30 August 2008, filed a Contested Case with the OHA alleging gender and race discrimination. Compl. ¶ VIII; Pl.'s Decl. ¶ 5 [DE-30]; Pl.'s Mem. Def.'s Mot. Summ. J. ("Pl.'s Resp.") at 1 [DE-29]; Def.'s Ex. B, Pl.'s Resp. Interrog. ¶ 9 [DE-26.4].

## A.    Disciplinary Action Against Plaintiff

On 2 December 2008, sometime after 5:00 p.m., Plaintiff left her state issued firearm in the women's restroom of the Rocky Mount DMV office and exited the building for the day. Pl.'s Decl. ¶ 6 [DE-30]. Plaintiff realized soon thereafter that she was missing her weapon and returned to the building to retrieve it. Pl.'s Decl. ¶ 6 [DE-30]. However, in the interim, a member of the building cleaning staff discovered the weapon and contacted the DMV headquarters in Raleigh. Bozard Dep. 33:20, 35:4-5, 55:14-17 [DE-29.2]; Def.'s Ex. A, Bozard Ltr. [DE-26.3]. The weapon was placed temporarily in the possession of a Senior Driver License Examiner. Def.'s Ex. A, Bozard Ltr. [DE-26.3]; Bozard Dep. 58:9-13 [DE-29.2]. Subsequently, Brian Bozard ("Bozard"), a white male and then Director of the Bureau,[2] contacted Otto Hayes ("Hayes"), a black male and Assistant Supervisor of the Bureau and Plaintiff's immediate supervisor, and requested Hayes retrieve the weapon. Bozard Dep. 9:19-20, 28:11-12, 37:19-20, 38:3-5; Pl.'s Ex. 2, Def.'s Resp. Interrog. ¶ 1D [DE-29.2]. When Hayes arrived at the Rocky Mount DMV office, he learned that Plaintiff had retrieved her weapon from the Senior Driver License Examiner and advised Bozard accordingly. Pl.'s Ex. 3, Hayes Ltr. [DE-29.2 at 151]; Def.'s Ex. A, Bozard Ltr. [DE-26.3].

On 15 December 2008, Plaintiff received a letter from George Lockamy ("Lockamy"), a white male and Deputy Director of the Bureau, notifying her of the recommendation that she be dismissed for "grossly inefficient job performance" which is defined pursuant to the Bureau's Policy

---

[2]  Bozard retired from the DMV on 1 May 2009. Bozard Dep. 9:24-25.

and Procedure Manual as job performance which results in "the creation of the potential for death or serious bodily injury to one or more members of the License or Theft Bureau or citizens or to one or more persons over whom the offending member has responsibility."[3] Pl.'s Ex. 4, Lockamy Ltr. [DE-29.2 at 148]; Pl.'s Ex. 2, Def.'s Resp. Interrog. ¶ 1A [DE-29.2]. On 18 December 2008, a pre-disciplinary conference was held in the DMV's Raleigh headquarters where Plaintiff was afforded the opportunity to respond to the dismissal recommendation. Pl.'s Ex. 4, Lockamy Ltr. [DE-29.2 at 148]. On 19 December 2008, Bozard notified Plaintiff in writing of his decision to suspend her without pay[4] for three consecutive work days due to grossly inefficient performance.[5] Def.'s Ex. A, Bozard Ltr. [DE-26.3]; Bozard Dep. 58:18-23. As a result of the written warning, Plaintiff was ineligible for promotion for eighteen months. Pl.'s Decl. ¶ 7; Bozard Dep. 60:2-3, 10-11.

## B. Disciplinary Action Against Other DMV Employees

1. Glenn Boykin

On 18 July 2005, Glenn Boykin ("Boykin"), a white male and a DMV Inspector, received a written warning for failure to secure his firearm in a manner that prevents accessibility to children

---

[3] In his deposition testimony, Bozard stated that he did not believe anyone recommended Plaintiff's dismissal and explained the December 15th letter was a form letter which provided a description of the severest form of punishment that could occur, which in Plaintiff's case was dismissal. Bozard Dep. 48:4-10, 49:5-8 [29.2].

[4] Bozard clarified through deposition testimony that his authority as director was limited to documenting situations warranting disciplinary action and making recommendations accordingly. However, the final decision rested solely with the Human Resources division of the Department of Transportation. Bozard Dep. 44:18-19, 45:17-21.

[5] During his deposition testimony, Bozard stated it was his responsibility to enforce the Bureau's policies and procedures and to notify appropriate personnel of possible violations thereof. Bozard Dep. 102:5-8. Accordingly, failure on his part to discipline Plaintiff would have been a violation of his duty as Deputy Director. Bozard Dep. 65:16-21, 66:1-6.

4

or other persons. Pl.'s Ex. 6, Boykin Ltr. [DE-29.2 at 132]; Aff. Joseph Gardner ("Gardner Aff.") ¶ 8 [DE-26.2]; Boykin Dep. at 44:6, 10. In particular, after completing work on 10 June 2005, Boykin returned to his residence and placed his loaded and holstered weapon in an unlocked armoire in his bedroom. Pl.'s Ex. 6, Boykin Ltr. [DE-29.2 at 132]; Boykin Dep. 23:9-11 [DE-29.3]. Boykin and his family, excluding his eighteen year-old daughter, left that weekend for a short trip. Bozard Dep. 68:18-22. Upon his return home Sunday night, Boykin discovered his weapon was missing and learned the following day that it had been stolen by a guest of his daughter over the weekend and subsequently traded for controlled substances. Pl.'s Ex. 6, Boykin Ltr. [DE-29.2 at 132]; Boykin Dep. 29:21-25, 30:9-10, 21-23 [DE-29.3]. Following DMV policy and procedure, Boykin reported the missing weapon to local law enforcement and to Bozard, District Supervisor at that time. Pl.'s Ex. 6, Boykin Ltr. [DE-29.2 at 132]; Boykin Dep. 22:11-12, 31:20-21, 32:21-23 [DE-29.3]; Bozard Dep. 69:1-4.

Boykin's written warning advised that (1) pursuant to DMV policy, off duty DMV employees must secure firearms in a manner that prevents accessibility to children or other persons and (2) pursuant to N.C. Gen. Stat. § 14-315.1, it is a misdemeanor crime to leave a firearm in a manner that gives access to an unsupervised minor. Pl.'s Ex. 6, Boykin Ltr. [DE-29.2]. Boykin's written warning provided no information as to disciplinary action; however, Bozard testified that Boykin was ineligible for promotion or a pay raise for eighteen months.[6] Bozard Dep. 88:21-24. Boykin

---

[6] It is unclear whether Boykin's action was a violation of DMV policy. In affidavit testimony, Joseph Gardner ("Gardner"), DMV Deputy Director of Operations, stated "[a]t the time [of Boykin's act], DMV policy did not make it clear that a weapon kept in [an unlocked armoire in one's bedroom] was not 'secured' or that any DMV policy violations had occurred." Gardner Aff. ¶ 8(b) [DE-26.2]. In deposition testimony, however, Boykin stated the storage of his weapon did not comply with DMV policy at the time. Boykin Dep. 27:19-23, 28:1-4 [DE-29.3]. Boykin's testimony is consistent with his written warning, which states "Agents shall take care to ensure that while off duty issued

5

was issued a replacement weapon and placed on desk duty for two days; however, his pay was not affected, he was not suspended from work and no criminal charges were brought against him. Bozard Dep. 88:24-25; 89:1-3; Boykin Dep. 36:18-24, 37, 38:20-23, 40:3-8.

## 2. Bobby McGee

The DMV service weapon belonging to Bobby McGee ("McGee"), a white male Inspector, was stolen when his state issued vehicle was moved from his home at night by an unknown individual with access to the key. McGee's service weapon was inside the vehicle and apparently untouched. No disciplinary action was taken against McGee as no policy infractions were committed by him. Gardner Aff. ¶ 8(a) [DE-26.2].

## 3. William Ballentine

The state issued weapon of William Ballentine ("Ballentine"), a white male Inspector, was stolen when his vehicle was stolen from his residence. The weapon was "secured" by the locks[7] on the vehicle and there were no known DMV policy violations. The incident was treated as a criminal matter, not a personnel matter, and a police report was filed. Having committed no policy violations, Mr. Ballentine was not disciplined. Gardner Aff. ¶ 8(d) [DE-26.2].

## 4. Jennifer Johnson Keel

The state issued vehicle of Jennifer Keel ("Keel"), a white female emissions auditor, was stolen from her office parking area. This incident was considered a theft and not a personnel matter

---

firearms are secured in a manner to prevent accessibility to children or other persons." [DE-29.2].

[7] In Bozard's written warning to Boykin, Bozard noted that the Bureau's Policy and Procedure provides that "Off duty agents may store their Bureau issued firearm in the locked trunk of their assigned vehicles." Pl.'s Ex. 6 [DE-29.2 at 157]. In his deposition testimony, Bozard emphasized the use of the word "may," and described the policy statement as "just a recommendation." Bozard Dep. 90:9-14 [DE-29.2].

6

as it was not known that Ms. Keel violated any DMV policies. This incident did not involve a firearm as Keel was not a sworn police officer and thus was never issued a service weapon. Gardner Aff. ¶ 8(c) [DE-26.2].

## 5. Unidentified Hispanic Male and African-American Female

In "the last few years," two License and Theft Bureau employees were disciplined for failure to secure their weapons. Gardner Aff. ¶ 9 [DE-26.2]. These employees, an Hispanic male and an African-American female, were each issued three day suspensions for failure to secure their weapons at a firing range in separate instances during official training exercises. *Id.* Both of these employees were supervisors at the time of their infractions.[8] *Id.*

## III. STANDARD OF REVIEW

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates "that there is no genuine dispute as to any material fact," thus entitling the moving party to judgment as a matter of law. FED. R. CIV. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). When the moving party has carried its burden under Rule 56, the nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts. The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations & footnote omitted) (quoting FED. R. CIV. P. 56).

---

[8] During discovery, Plaintiff identified the treatment of Boykin, McGee, Keel and Ballentine as evidence of disparate treatment. Def.'s Ex. B, Pl.'s Resp. Interrog. ¶ 1 [DE-26.4]. Plaintiff does not rely on the treatment of the unidentified Hispanic male or African-American in support of her allegations and in fact, makes no reference thereto. Plaintiff does, however, allege that a black female, Marva Courtney ("Courtney"), was terminated for leaving her firearm inside a secured building. Pl.'s Resp. at 12; *see also* Def.'s Ex. B, Pl.'s Resp. Interrog. ¶ 1 [DE-26.4] (identifying the black female as *Michelle* Courtney) (emphasis added).

7

The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine. FED. R. CIV. P. 56(a); *see Anderson*, 477 U.S. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## IV. APPLICABLE LAW

### A. 42 U.S.C. § 1983

Section 1983 does not confer any substantive rights, but rather permits a plaintiff to assert a direct cause of action against any *person* who under color of law violates federally protected rights, privileges or immunities. *Googerdy v. N.C. Agric. & Tech. St. Univ.*, 386 F. Supp. 2d 618, 625 (M.D.N.C. 2005); *see also Lambert v. Williams*, 223 F.3d 257, 260 (4th Cir. 2000); *Albright v. Oliver*, 510 U.S. 266, 271 (1994). It is well-established that a state or a state agency may not be held liable under section 1983 because it is not a "person" under the statute. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1983); *Amaram v. Va. State Univ.*, 476 F. Supp. 2d 535, 541 (E.D. Va. 2007) ("It is a matter of black letter law that a private individual cannot maintain a § 1983 suit against a state or a state agency in federal court on the basis of Eleventh Amendment immunity."); *Morris v. Univ. of Va. Police Dep't*, No. 96-0031-C, 1997 U.S. Dist. LEXIS 3362, *5-6, 1997 WL 129320, at *2 (W.D. Va. Mar. 19, 1997) ("It is immaterial whether plaintiff is seeking injunctive or declaratory relief; the law is clear that a state cannot be sued under § 1983 unless it has waived its

8

Eleventh Amendment immunity.").[9] Because there is no evidence that the DOT has consented to suit, thereby waiving its immunity, the court recommends Defendant's motion for summary judgment with respect to Plaintiff's section 1983 discrimination claim be allowed.

**B. 42 U.S.C. § 2000e**

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . race [or] . . . sex." 42 U.S.C. § 2000e-2(a)(1). Congress has expressly abrogated a state's Eleventh Amendment immunity for purposes of Title VII. *King v. McMillan*, 594 F.3d 301, 309 (4th Cir. 2010) (*citing Fitzpatrick v. Bitzer*, 427 U.S. 445, 448-49 (1976)). To survive summary judgment, a plaintiff may establish a claim of discrimination "through two avenues of proof" – the mixed-motive framework or the pretext framework. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004); *accord Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005). Regardless of the framework under which a plaintiff pursues a discrimination claim, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 153 (2000).[10]

---

[9] The Supreme Court has recognized, however, that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will*, 491 U.S. at 71 n.10 (citations omitted). While Plaintiff seeks prospective, as well as monetary, relief, *see* Compl. at 5-6, Plaintiff has not named a state official in her lawsuit.

[10] Defendant argues Plaintiff must prove both that the reason proffered by Defendant is false and discrimination was the true reason for discipline. Def.'s Reply at 2-3. However, in *Reeves*, the Supreme Court invalidated the requirement that a plaintiff show pretext plus some additional evidence of discrimination. 530 U.S. at 148; *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000).

9

Plaintiff does not present a mixed-motive theory, relying instead on the pretext method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973). *See* Pl.'s Resp. at 8, 13.

## V. ANALYSIS

In *McDonnell Douglas,* the Court "established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). First, the plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). The prima facie case varies depending on the factual nature of the claim. *See McDonnell Douglas*, 411 U.S. at 802 n.13; *Miles v. Dell., Inc.*, 429 F.3d 480, 486-87 (4th Cir. 2005); *Moore v. Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985); *see also Diamond*, 416 F.3d at 318 (explaining "the elements of the prima facie case [are constructed] to give plaintiffs who lack direct evidence a method for raising an inference of discrimination."). If the plaintiff establishes a *prima facie* case, an inference of discrimination is raised and the burden shifts to defendant to produce admissible evidence that the defendant took adverse employment action "for a legitimate, non-discriminatory reason." *Burdine*, 450 U.S. at 254. Third, if defendant carries its burden, the presumption of discrimination created by the *prima facie* case disappears from the case, and the plaintiff must then prove by a preponderance of the evidence that defendant's articulated reason was a pretext for unlawful discrimination. *See id.* at 253-55. A plaintiff can demonstrate pretext by showing that the employer's "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [illegal] discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004) (quotation omitted).

10

## A. Disparate Discipline

Plaintiff alleges that she was subjected to discriminatory discipline based on her race and gender in violation of Title VII.   Compl. ¶¶ VI, IX, Count Two; Pl.'s Resp. at 1 [DE-29].

1. <u>There is a genuine dispute as to whether Plaintiff is similarly-situated to an employee outside the protected class.</u>

Plaintiff seeks to establish a prima facie case of race and gender discrimination by pointing to a white male (Boykin) whom she alleges was disciplined less harshly for more egregious violations of DMV Policy and Procedure.[11] Pl.'s Resp. at 9; Compl. ¶ IX.  To establish a *prima facie* case of discrimination in the enforcement of employee disciplinary measures, the plaintiff must show: (1) she is a member of a class protected by Title VII, (2) the prohibited conduct in which she engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) the disciplinary measures enforced against her were more severe than those enforced against those other employees.  *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993) (citing *Moore*, 754 F.2d at 1105-06) (adapting the *McDonnell Douglas* framework for the employee discipline context)); *accord Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008).  Once the inference of discrimination is established through the *prima facie* case, the employer must produce admissible evidence demonstrating the adverse employment action was taken "for a

---

[11] In her complaint, Plaintiff alleges "other Caucasian male co-workers" committed similar offenses but received less severe punishment. Compl. ¶ IX.   In discovery materials, Plaintiff identifies three additional potential comparators: Bobby McGee, Jennifer Keel, William Ballentine.  Def.'s Ex. B, Pl.'s Resp. Interrog. ¶ 1 [DE-26.4].  Plaintiff offers no discussion in her briefing as to how these three employees may be considered similarly-situated comparators to Plaintiff.  Rather, Plaintiff focuses solely on Boykin's conduct.  *See* Pl.'s Resp. at 9 (describing Boykin as Plaintiff's "primary comparator").  Moreover, the incidents involving the other employees are distinguished from Plaintiff's in that each was treated as a criminal matter because they did not involve a Bureau policy violation. *See* Gardner Aff. ¶ 8 [DE-26.2].

11

legitimate, non-discriminatory reason." *Burdine*, 450 U.S. at 254.

As for element one, it is undisputed that Plaintiff, as an African-American woman, is a member of a protected class. The parties also do not dispute the third element of the *prima facie* showing - that Boykin's discipline differed from Plaintiff's in that only Plaintiff received a three day suspension without pay. Def.'s Ex. A, Bozard Ltr. [DE-26.3]; Bozard Dep. 58:18-23, 88:24-25; Boykin Dep.37:13-19.

As for the second element, in discriminatory discipline cases, a plaintiff must show that she is similarly situated to one outside the protected class "with respect to performance, qualifications, and conduct." *Holtz v. Jefferson Smurfit Corp.*, 408 F. Supp. 2d 193, 206 (M.D.N.C. 2006) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). In that regard, the employee must generally show the same decisionmaker made the disparate employment decisions. *Id.* (quoting *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 972 (8th Cir. 1994)); *McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F. Supp. 2d 595, 610 (E.D.N.C. 2006) ("To be similarly situated the employees must have been disciplined by the same supervisor.") (citing *Radue*, 219 F.3d at 618)). Additionally, when assessing the seriousness of misconduct, "precise equivalence in culpability between employees is not the ultimate question . . . comparison can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender." *Moore*, 754 F.2d at 1107 (internal quotation marks & citations omitted); *accord Lightner*, 545 F.3d at 265. In determining whether two employees are similarly situated, a court must look at all relevant factors, the number of which depends on the context of the case. *Disher v. Weaver*, 308 F. Supp. 2d 614, 621 (M.D.N.C. 2004) (quoting *Radue*, 219 F.3d at 617). As *Moore* instructed, courts should remain mindful that "a principled determination of 'comparable seriousness' require[s] at least initial

deference to the system of offenses created by [the employer]." *Id.* at 1108. This inquiry assigns to lower courts the "difficult, but not unfamiliar, task of assessing the gravity of the offenses on a relative scale." *Id.* at 1107. In considering whether a potential comparator is similarly-situated, the court should consider whether the comparator "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [his] conduct or the employer's treatment of [him] for it." *Holtz*, 408 F. Supp. 2d at 206 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

Plaintiff has identified Boykin as her "primary comparator." Pl.'s Resp. at 9. Plaintiff and Boykin share several relevant similarities. Each was employed as an Inspector of the same departmental unit at the time of their respective disciplinary actions. Gardner Aff. ¶¶ 3, 8(b) [DE-26.2]. Each was disciplined by Bozard for activity related to the storage of their service weapon, activity which occurred off duty. Def.'s Ex. A, Bozard Ltr. [DE-26.3]; Pl.'s Ex. 6, Boykin Ltr. [DE-29.2 at 132]. The differences between the two are the particular circumstances around which the actions occurred, including whether DMV policy was violated in each instance.

Plaintiff was suspended by Boykin for "grossly inefficient job performance" arising from "the creation of the potential for death or serious bodily injury to one or more employees or to members of the public, or to one or more persons for which [Plaintiff] has responsibility." Pl.'s Ex. 5 [DE-26-3]. Plaintiff's conduct was found to have violated DMV License and Theft Bureau Policy and Procedure Directive 5.01 (Disciplinary System) General Guideline D(3)(b)(2c) and the North Carolina Department of Transportation's Disciplinary Action, Suspension and Dismissal Policy. *Id.*

Boykin received a written warning for "unacceptable personal conduct" from Bozard. Pl.'s Ex. 6 [DE-29-2]. Boykin's conduct was deemed to have been a "willful violation of known or

13

written work rules." *Id.* The written warning identifies these "work rules" as DMV License and Theft Bureau Policy and Procedure General Order 45IIIK, which provides that "no agent shall leave firearms unsecured. Off duty agents may store their Bureau issued firearm in the locked trunk of their assigned vehicle." *Id.* The policy instructs further that agents shall take care to ensure that while off duty issued firearms are secured in a manner to prevent accessibility to children or other persons. *Id.* The warning advised that North Carolina General Statute § 14-315.1 makes it a misdemeanor crime to leave a firearm in a manner to which an unsupervised minor could gain access without the lawful permission of the minor's parents. *Id.* Boykin testified that the manner in which he stored his gun in his bedroom armoire violated DMV policy. Boykin Dep. 27:19-23, 28:1-4 [DE-29.3]. In particular, Boykin testified that according to policy, his weapon should have been stored or secured where no children or anyone could gain access to it without a key or combination. Boykin Dep. 27:3-4. According to Boykin, "secured" means placed inside something that is locked, and if his weapon were placed in a locked cabinet or safe there would have been no policy violation. Boykin Dep. 28:1-8. Boykin testified further that Bozard told him he violated DMV policy. Boykin Dep. 35:7-14.

Despite the above, Defendant contends Boykin is not comparable to Plaintiff because "at the time there was no policy that clearly stated [Boykin] did not safely secure the weapon." Def's. Mem. at 11. DMV Deputy Director of Operations Joseph Gardner has testified by affidavit that Boykin's weapon was "arguably secured" according to DMV policy because the home was locked and the weapon was located in a piece of furniture. Gardner Aff. ¶ 8b [DE-26.2].[12] Gardner testified that

---

[12] This position is untenable in light of the undisputed fact that Boykin's daughter had access to the home and was at home during the time at issue. Bozard Dep. 68:18-22.

DMV policy, at that time, did not make clear that a weapon maintained in an unlocked armoire was not secured. *Id.* This inconsistent testimony by Defendant raises a "genuine dispute" as to whether Boykin and Plaintiff are comparable. FED. R. CIV. P. 56(a). In particular, there is an issue of fact whether Boykin's actions violated a policy, the scope of such a policy and whether the policy is sufficiently similar to the policy violation by Plaintiff. *See Disher*, 308 F. Supp. 2d at 321 (question of fact remained whether plaintiff violated employer procedure). The resolution of this fact is critical. In order to understand the gravity of Boykin's actions as compared to Plaintiff's and to appreciate the employer's disciplinary scheme, as instructed by *Moore*, this court must determine whether Boykin's actions violated DMV policy. Defendant's equivocation whether Boykin violated policy works not to undermine Plaintiff's *prima facie* case but to create a genuine dispute.

**B.      Pattern and Practice Evidence of Disparate Treatment**

In her complaint, Plaintiff asserts that Defendant maintains a policy, practice and custom of discriminating against Plaintiff for exercising her rights under Title VII and depriving her of equal employment opportunities. Compl. ¶ 1. Plaintiff clarifies in her briefing that Bozard has a history, pattern and practice of discriminating against non-white employees who worked under his supervision. Pl.'s Resp. at 8. In addition, Plaintiff contends that Defendant subjects blacks to harsher discipline for similar conduct. *Id.* at 12. At the outset, the court notes that pattern or practice claims can be asserted only in class actions. *Williams v. Henderson*, 129 Fed. App'x 806, 813 n.2 (4th Cir. 2005) (citing *Lowery v. Circuit City Stores, Inc.*, 158 F.3d 742, 761 (4th Cir. 1998), *vacated on other grounds*, 527 U.S. 103 (1999)). Nevertheless, such evidence may be relevant to Plaintiff's other claims of discrimination. *Houston v. Perkins*, No. 1:08-CV-826, 2010 U.S. Dist. LEXIS 17165, at * n.9, 2010 WL 731274, at *7 n.9 (M.D.N.C. Feb. 25, 2010). The court therefore reviews

15

Plaintiff's evidence in support of her claim of individual disparate treatment.

Plaintiff compares the treatment of two African-American DMV employees, an unnamed male DMV inspector (identified by Plaintiff as "Employee X") and Courtney, to white employees allegedly engaging in the same or similar conduct. Pl.'s Resp. at 12. First, Plaintiff compares the discipline imposed against Employee X to that allegedly imposed on an unnamed white male. Employee X received a written warning and a five day suspension without pay and was ordered to attend a 40-hour remedial firearms handling course for inadvertently leaving his state issued weapon in an emissions station where he was conducting a covert inspection.[13] Bozard Dep. 96:13-18, 97:9-12, 108:15-24 [DE-29.2]; Gardner Aff. ¶ 10 [DE-26.2]. However, according to Plaintiff, this discipline was much harsher than that imposed on

> a *white* male employee [who] received *only* a written warning in 2007 even though he failed to report a missing or stolen weapon (magazine), had received a previous warning for unacceptable personal conduct [for] willful violation of known or written work rule[s] and [] insubordination for failing to report to an administrative hearing after being instructed to do so by an immediate supervisor.

Pl.'s Resp. at 12 (emphasis added). The evidence that Plaintiff points to in support of this claim is Defendant's Disciplinary Action Report ("DAR"). *See* Def.'s Initial Disclosures [DE-29.1 at 5-6]. This report provides the job title, race and gender of employees cited for DMV policy violations between 2005 and 2009. The DAR indicates that in 2007, one white male was disciplined for unsatisfactory job performance ("UJP") and in particular, "[f]ailure to properly supervise employees" - a violation in stark contrast to the 2007 violation identified by Plaintiff. *Id.* This evidence is simply too vague to draw the necessary comparison and to support Plaintiff's assertion. *See Moore,*

---

[13] Bozard explained that unlike the case of Plaintiff and Boykin, he was not in the chain of command of the unidentified black male and played no role in the disciplinary action imposed. Bozard Dep. 105:9-14, 111:9-12.

754 F.2d at 1106-10 (holding that fact-finding was deficient where premised on "an unprincipled conception of 'similarity' and 'comparability,' a structural flaw").

The court notes the only documentation evidencing the discipline of an employee for the actions described above by Plaintiff is an 18 April 2007 letter from Mr. J. I. Edwards ("Edwards"), then Deputy Director of the Bureau, which provides in pertinent part:

The specific job performance issues that represent the basis for this written warning are:

1. The loss of or damage to State property
2. Failure to comply with the License and Theft Bureau's General Orders governing firearms and missing or stolen equipment.

*See* Pl.'s Ex. 7, Edwards Ltr. [DE-29.2 at 134]. The letter contains no identification of the employee's name, race or gender. *Id.* However, the DAR documents an 18 April 2007 disciplinary action taken by Edwards against a *black* male for UJP and in particular, "[f]ailure to comply with [License and Theft Bureau] rules and reg[ulation]s causing damage to State property" - a description identical in substance to that found in the 18 April 2007 letter. *See* Def.'s Initial Disclosures [DE-29.1 at 5]. As the only evidence presented in support of Plaintiff's claim that black employees received harsher discipline than white employees is evidence of disciplinary action imposed on a *black* employee for actions which Plaintiff claims *is deserving of harsher discipline*, this disciplinary example does not support any viable claim raised by Plaintiff.

Plaintiff discusses also the discipline imposed on Courtney as compared to similarly situated white employees. In particular, Plaintiff notes that Bozard suspended Courtney for three days for leaving her state issued weapon unsecured in a classroom "despite the fact that others routinely left their weapons in classrooms." Pl.'s Resp. at 12. Plaintiff's provides no description of these allegedly "routine" incidents. In fact, Plaintiff's only offer of proof in support of this allegation is citation to

17

what appears to be a state civil action. However, this assertion is merely a conclusory belief which cannot defeat a summary judgment motion. *See Farrar v. Dorothea Dix Hosp.*, 829 F. Supp. 140, 146 (E.D.N.C. 1993) (explaining "a district court may not consider hearsay evidence which would be inadmissible at trial in evaluating a motion for summary judgment"). Accordingly, this evidence does not lend further support to any of Plaintiff's viable claims.

## C. Retaliation

Plaintiff alleges further that Defendant rejected her for promotion and disciplined her in retaliation for engaging in protected activity, and in particular, articulating her opposition to gender discrimination, in violation of Title VII. Compl. ¶¶ IX, Count One; Pl.'s Decl. ¶ 5 [DE-30]. Defendant, despite seeking summary judgment on all claims, *see* Def.'s Mem. at 13 [DE-26], has not included argument on this claim in its principal brief. However, Defendant has presented evidence in the form of affidavit and deposition testimony discussing its rationale for denying Plaintiff promotion to numerous positions. Pl.'s Ex. 2, Def.'s Resp. Interrog. ¶¶ 1-2 [DE-29.2]. Similarly, Plaintiff has provided no analysis regarding her retaliation claim, stating only that she "applied for promotions between June 2008 and August 2008 [and] [a]fter being rejected for each position," filed a grievance with the OHA. Pl.'s Resp. at 1. In her declaration, however, Plaintiff identifies the positions she contends she was denied. Pl.'s Decl. ¶ 8 [DE-30]. Regardless of the parties' failure to discuss this issue in their briefs, the court finds sufficient undisputed evidence in the record demonstrating the claim must fail.

Under 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge,

18

testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." To prevail on a claim for retaliation under Title VII, a plaintiff must show (1) she engaged in protected activity, (2) the employer took adverse employment action against her, and (3) a causal connection existed between the protected activity and the adverse action. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). The protected activity must either oppose a practice prohibited under Title VII (pursuant to the opposition clause)[14] or make a charge, testify, assist, or participate in an investigation, proceeding, or hearing under Title VII (pursuant to the participation clause). *Davis*, 639 F. Supp. 2d at 617; 42 U.S.C. § 2000e-3(a).

Plaintiff alleges that she was not promoted and was disciplined in retaliation for gender and discrimination complaints filed in 2008 with the OHA. Compl. ¶¶ IX, X; Pl.'s Decl. ¶ 8. It is undisputed that Plaintiff engaged in protected activity when she filed grievances with the Human Resources Department regarding her failed promotions and reported race and gender discrimination to the OHA or that her discipline, in the form of a three day unpaid suspension, constitutes an adverse employment action. As such, the only issue is whether Plaintiff has proven a causal link between her reports of discrimination and the alleged retaliation.

In proving a causal connection, Plaintiff, based on her declaration, relies on the timing of the adverse actions taken against her. In particular, Plaintiff contends she applied for numerous positions subsequent to her disciplinary action in December 2008 "but did not received [sic] any of these positions because [she] was retaliated against for leaving [her] firearm in a secured building

---

[14] "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Davis v. Dimensions Health Corp.*, 639 F. Supp. 2d 610, 617 (D. Md. 2009) (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)).

and for filing a contested case with the [OHA] in 2008 regarding gender and race discrimination." Pl.'s Decl. ¶ 8 [DE-30]. To prove that her failed promotions and discipline were causally connected to her reports of gender and race discrimination to the OHA, Plaintiff must demonstrate that Defendant disciplined her and failed to promote her because of the August 2008 OHA complaint. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). As "an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of the prima facie case." *Id.* In *Dowe*, the court found that the plaintiff could not establish this causal connection because it was undisputed that the relevant decisionmaker was unaware of the protected activity. *See id.* The court reached this conclusion despite noting that others who worked for the employer had learned of the plaintiff's EEOC complaint. *See id.* at 655; *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 444 (4th Cir. 1998) (finding plaintiff failed to prove causation where she presented no evidence that supervisor who fired her knew of plaintiff's prior discrimination charge). As in *Dowe*, Plaintiff has not presented any evidence demonstrating that anyone involved in the decision to discipline her or to deny her promotions knew about her OHA complaint. The court notes that in deposition testimony, Bozard testified that he could not "remember any suit involving or any action or any grievance involving [Plaintiff]" but acknowledged receiving notifications advising that he had been identified as a witness in various grievance matters filed by employees. Bozard Dep. 24:17-25, 25:1-2 [DE-29.2].

Assuming, *arguendo*, that Plaintiff has proffered sufficient evidence to prove a *prima facie* case, there is sufficient evidence in the record that the disciplinary action taken against Plaintiff and her promotion denials were not motivated by retaliation. Defendant has argued that Plaintiff's

20

discipline resulted from her failure to properly secure her weapon and as a result, was ineligible for promotion for eighteen months. Def.'s Mem. at 12; Coltrane Aff. ¶ 2 [DE-31.1]. Here, Plaintiff has not refuted any of Defendant's evidence as to her unacceptable job performance. Indeed, Plaintiff's admission that she committed conduct rightfully sanctionable by her employer belies her claim that Defendant acted with retaliatory animus. Def.'s Ex. B, Pl.'s Resp. Req. Admis. ¶¶ 1-4 [DE-26.4 at 6-7]. Furthermore, Defendant has presented evidence, through the affidavit of Jack Coltrane ("Coltrane"), Deputy Director for Personnel and Administration, detailing legitimate reasons for not promoting Plaintiff to the nine positions identified in her declaration for which she allegedly applied[15] subsequent to the filing of her 2008 OHA complaint.[16] Coltrane Aff. ¶¶ 5-9 [DE-31.1]. The reasons provided include the fact Plaintiff was ineligible for promotional consideration for any position posted during the eighteen months following her disciplinary action in December 2008, Plaintiff's experience level relative to those hired, including Plaintiff's lack of supervisory experience, and management policy to give priority to applicants of equal rank seeking a lateral transfer. Coltrane Aff. ¶¶ 5-9 [DE-31.1]. As Plaintiff has failed to show that the reasons offered by Defendant are a pretext for discrimination, Defendant's motion for summary judgment on Plaintiff's retaliation claim should be allowed.

---

[15] Plaintiff stated that she applied for the position of Law Enforcement Supervisor (#60031022), *see* Pl.'s Dec. ¶ 8 [DE-30]; however, through affidavit testimony, Coltrane stated DMV records indicate Plaintiff did not apply for this position. Coltrane Aff. ¶ 6 [DE-31.1].

[16] The court notes the position of Law Enforcement Manager (#60030919) was posted 9 July 2008 through 15 July 2008 and thus prior to the filing of Plaintiff's OHA complaint. Pl.'s Ex. 2, Def.'s Resp. Irrogs. ¶ 1C [DE-29.2 at 125]. Nevertheless, Defendant did not conduct any interviews for this position which remains vacant. *Id.*

## D. Disparate Impact

In Plaintiff's response to Defendant's motion for summary judgment, Plaintiff raises a disparate impact claim. In particular, Plaintiff contends that Bozard's discretionary decisions regarding the implementation and issuance of discipline "had a disparate impact on the minority females working under Bozard." Pl.'s Resp. at 12. Plaintiff, however, did not allege a disparate impact cause of action in her complaint. Indeed, her complaint allegations are focused solely on her alleged disparate treatment. *See* Compl. ¶¶ V, VI, IX.

While this court recognizes the liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a), the court notes that "[t]his standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage." *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 455 F. Supp. 2d 399, 436 (D. Md. 2006). Indeed, well-established precedent holds that it is improper for a party to seek to amend her complaint through argument in a response brief opposing summary judgment. *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contr. Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citing *Wahi v. Charleston Area Medical Center, Inc.*, 562 F.3d 599, 617 (4th Cir. 2009)); *see also Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with FED. R. CIV. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990) ("As the district court correctly noted, this claim was not raised in [plaintiff's] second amended complaint but, rather, was raised in his response to the defendants' motions for summary judgment and, as such, was not properly before the court."). Here, Plaintiff has not amended her complaint to add a disparate impact

22

claim. Accordingly, a disparate impact claim is not properly before the court.

## E. Hostile Work Environment

Finally, the court notes that in Plaintiff's response, she refers to her working conditions as a "hostile work environment." Pl.'s Decl. ¶ 9 [DE-30]. To the extent Plaintiff now seeks to pursue a hostile work environment claim under Title VII, Plaintiff did not allege such cause of action in her complaint, nor did she otherwise set forth any supportive allegations therein. Furthermore, this line of argument is not included in Plaintiff's briefing. Accordingly, for the reasons provided above, a hostile work environment claim is not properly before the court.

## V.  CONCLUSION

For the reasons stated above, this court RECOMMENDS Defendant's motion for summary judgment be ALLOWED IN PART and DENIED IN PART.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This, the 23rd day of December, 2010.

Robert B. Jones, Jr.
United States Magistrate Judge